[Cite as *Avila v. Hughes*, 2021-Ohio-2463.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

AMBER AVILA,                          :

    Appellant,                        :          CASE NO. CA2020-08-047

                                      :          O P I N I O N
- vs -                                              7/19/2021

                                      :

MATTHEW HUGHES, et al.,                :

    Appellees.                        :


CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 18CV91781


Thomas G. Eagle Co., L.P.A., and Thomas G. Eagle, for appellant.

Kaufman & Florence, and Wm. Robert Kaufman, for appellees.


**BYRNE, J.**

{¶1} This case involves a dispute regarding the sale of a residential home. Appellant, Amber Avila, appeals the decision and entry of the Warren County Court of Common Pleas granting summary judgment in favor of appellees, Christy Hughes and Matthew Hughes (collectively the "Hugheses"), with regard to Avila's claim of fraudulent misrepresentation, nondisclosure, or concealment. Because the conditions that Avila complains of were either open and able to be discovered upon reasonable inspection or were otherwise not actionable as a basis for a fraudulent misrepresentation, nondisclosure,

or concealment claim, we affirm the trial court's decision.

## I. Background

### A. Status of Claims

{¶2} Avila brought claims against five codefendants: Christy and Matthew Hughes, American Home Shield, The Home Inspection Guy, and Paul Grilliot. Avila settled and dismissed her claims against American Home Shield, so it is no longer a party to this case. The Home Inspection Guy and Paul Grilliot failed to appear and as a result they were held in default. The trial court entered default judgment against The Home Inspection Guy and Grilliot in the amount of $166,657.52 (more than the $150,000 Avila paid for the house) jointly and severally, plus costs. The Hugheses are therefore the only remaining active defendants.

{¶3} Avila brought two claims against the Hugheses: a claim for breach of contract, and a claim for fraudulent misrepresentation, nondisclosure, or concealment. The Hugheses only sought summary judgment with respect to the fraudulent misrepresentation, nondisclosure, or concealment claim, not the breach of contract claim. As a result, the breach of contract claim is still awaiting trial.

{¶4} Avila filed a motion requesting that the trial court certify its decision granting the Hugheses' motion for summary judgment as a final appealable order pursuant to Rule 54(B) of the Ohio Rules of Civil Procedure. In support, Avila argued that "it is not practical or efficient to try the remaining issues in this case until after an appeal of the dismissed count is addressed, or otherwise there could be two trials." Under these circumstances the trial court's decision to designate its summary judgment decision and entry as a final appealable order was appropriate. See Wisinstainer v. Elcen Power Strut Co., 67 Ohio St. 3d 352, 354-55 (1993) ("The trial court has seen the development of the case, is familiar with much of the evidence, is most familiar with the trial court calendar, and can best

determine any likely detrimental effect of piecemeal litigation. More important than the avoidance of piecemeal appeals is the avoidance of piecemeal trials"). We therefore proceed with reviewing Avila's appeal.

## B. Relevant Facts and Procedural History

{¶5} On July 28, 2017, Avila entered into a contract to purchase a 130-year-old home in Lebanon, Ohio from the Hugheses. Avila and the Hugheses did not communicate at all in connection with the sale of the home, except that prior to purchasing the home Avila received the Hugheses' Residential Property Disclosure Form ("Disclosure Form"). The Disclosure Form stated:

> WATER INTRUSION: Do you know of any previous or current water leakage, water accumulation, excess moisture or other defects to the property, including but not limited to any area below grade, basement or crawl space?

The Hugheses marked "yes" and described the condition as the "basement gets wet when it rains but then dries out." Under the "mechanical systems" heading, the Hugheses also indicated they knew there was a problem or defect with the chimney/fireplace but noted that the "fireplace/chimney not used/never inspected." In that same section, they denied knowledge of any problem or defect with the water softener because it was "never used."

{¶6} In the portion of the Disclosure Form regarding structural components of the home, a question asked whether the Hugheses "know of any previous or current movement, shifting, deterioration, material cracks/settling (other than visible minor cracks or blemishes) or any other material problem with the foundation, basement/crawl space, floors, or interior/exterior walls." The Hugheses marked "yes." The form stated that if they marked "yes" then they should "describe and indicate any repairs, alterations or modifications to control the cause or effect of any problem identified (but not longer than the past 5 years)," and the Hugheses wrote, "with stone foundation in basement."

{¶7} The Disclosure Form also stated that "Purchaser is advised that every home contains mold. Some people are more sensitive to mold than others. If concerned about this issue, purchaser is encouraged to have a mold inspection done by a qualified inspector."

{¶8} After entering into the purchase contract, Avila hired a home inspector to perform an inspection. The inspector determined that the home had significant problems. Specifically, the inspector's written report listed numerous defects with the home, including: rotten wood on the roof needing replacement, water spots, a defective chimney, the chimney needed tuckpoint work, defective siding, a plumbing pipe in the roof that leaked, defective foundation, foundation walls with holes letting water enter, a bad basement window, a 23-year-old HVAC, possible asbestos tape on the ductwork, numerous electrical issues including faulty exterior wiring, lack of grounding in parts of the house, double-tapped terminals, knob and tube wiring, exposed wiring in the attic, spliced wires outside the junction boxes in the garage, other dangerous wiring in the garage, a door with code violations, missing mortar, and mouse nests in the attic so large Avila herself could fit in them.

{¶9} Because Avila's loan was to be financed by the United States Department of Agriculture ("USDA"), the USDA sent a list of repairs to be made based on the results of the inspection report. In relevant part:

1. ELECTRIC – Ensure all knob and tube wiring has been terminated and capped (no longer in use). Remove all double taps from breaker box. Ensure all outlets located within 6 feet of water areas in kitchen, garage and exterior have GFCI outlet protection. Replace missing coverplate in master bedroom. Enclose exterior exposed wiring in conduit and secure to exterior wall. Install 1 smoke detector per level of dwelling (hardwired if possible), inclusive of basement. There must be one smoke detector adjacent to all sleeping rooms. Repair all defective wiring in detached garage.

2. Complete necessary tuck point repairs to chimney.

3. Replace section of rotted/missing fascia board at valley.

4. Enclose all tape on duct work with appearance of asbestos in appropriate heat-rated duct tape.

5. Install new insulated exterior door to rooftop and install safety railings on the roof.  OR Remove door completely and install drywall and finish seams flush to match the existing wall (interior) and install exterior siding flush to match exterior existing wall with no gaps, cracks or other areas where weather or animals could intrude.

6. Install handrail at staircase.

7. Install fixture covers to all bare bulbs in closets.

8. Remove all nests from attic.  Ensure insulation is free of animal feces or remains.  Install screens over gable vents to prevent further access for animals.

9. Make necessary masonry repairs to exterior cracks in basement foundation walls.

10. Install glass block security window for basement window.

11. Trim trees back from electrical service lines.

{¶10}  As a result, the Hugheses testified that they made repairs to their home.  The home was then reinspected by Avila's home inspector, who issued a second inspection report which stated:

> The work that was to be completed, electrical, foundation, and soffit were all done.  All looked good at the walk-through inspection I performed on 9/19/17.  I have no concerns for the property at this time.  Junction boxes were in place, the wiring in the panel had been addressed, the soffit and the valley had been addressed, cover plates were in place, and the knob and tube wiring had been removed in the basement.

{¶11}  Following the second inspection, Avila did not request any additional repairs or indicate any further need to investigate the condition of the house.  Avila decided to proceed with purchasing the house.  The parties closed on the sale of the house on October

2, 2017, and Avila moved in that same month.

{¶12} In December 2019, Avila filed her complaint in this case. As it relates to the Hugheses and this appeal, Avila brought a claim for fraudulent misrepresentation, nondisclosure, or concealment of the following defects that she claimed to have discovered in the home:

> (1) Water intrusion or leading, including at the roof, gutters, basement, (2) the water heater, (3) mold, (4) The windows and other structural components, (5) the masonry, including the chimneys, (6) pests and vermin, (7) water quality, (8) the sewer system, (9) water damage, (10) electrical systems, (11) other conditions, including the water softener, (12) garage door opener, (13) HVAC systems including duct work, (14) the stove/oven, (15) the foundation, (16) drainage/erosion, (17) code violations, (18) the attic, (19) windows and doors, (20) other conditions on the premises

{¶13} On November 1, 2019, the Hugheses moved for summary judgment on this claim. After briefing, the trial court granted the Hugheses' summary judgment motion. The trial court sorted the 20 alleged house defects that Avila had identified into eight broad groupings. For most of these groupings, the trial court concluded that the alleged defects were open and discoverable upon reasonable inspection and therefore Avila's fraud claims with respect to those defects were precluded by the doctrine of caveat emptor. The trial court determined that the remaining defects failed because the real estate purchase contract was contingent upon inspection. Since certain repairs were required to be made prior to closing and a subsequent inspection was completed after those repairs were made, the trial court concluded that Avila could not have "justifiably relied" upon the Hugheses representations and Avila's fraudulent concealment claim failed as a matter of law.

## II. Deposition Testimony

{¶14} To facilitate discussion, we find it necessary to briefly describe the relevant

deposition testimony.[1]

## A. Christy Hughes' Testimony

{¶15} Christy Hughes testified that she purchased the home in August 2001 when she was 21 years old. She resided in the home with her then-husband, Michael Lawson, until 2006 or 2007. Christy's second husband, Matthew Hughes, moved in much later and lived in the home after they were married in 2013 until they sold the house to Avila in 2017.

{¶16} Christy testified that she had no problems with the home when she bought it. However, over the years, she remodeled the home in several respects. For example, she remodeled the upstairs and downstairs bathrooms, removed wallpaper, and painted the outside of the home.

{¶17} Christy also recalled several repairs that were completed over the years. For example, the porch roof was replaced after a board started to rot. Additionally, Christy's father, an electrician, repaired an electrical issue for her. Other examples included the replacement or repair of a rotted board caused by a bad gutter, the repair of a leak in the garage, the repair of two cracked windows, and occasional mice issues that were addressed.

{¶18} Christy also testified that the downstairs bathroom tub came loose in the corner and water leaked behind it, damaging the drywall. Matthew replaced the damaged drywall with moisture resistant drywall and secured the tub back onto the wall. Christy testified that they did not have any issues with the tub or drywall after this repair.

{¶19} Aside from the issues identified in the Disclosure Form, Christy stated that she was unaware of any problems with the home at the time of the sale.

---

1. Avila has also presented an affidavit from Rob Fickert regarding the condition of the property. Fickert is a construction and restoration professional retained by Avila to perform an inspection and evaluation of the residence.

## B. Matthew Hughes' Testimony

{¶20} Matthew Hughes moved into the home in 2013, approximately four years prior to the sale of the home. Matthew testified regarding some of the same remodeling and repairs about which Christy testified. For example, Matthew explained that he remodeled a bedroom, painted rooms and entryways, and resurfaced floors. He also testified about a repair that had been made in the garage where a tree had damaged part of the roof.

{¶21} Like Christy, Matthew recalled the downstairs bathroom tub coming loose and water damaging the drywall. He described how he reattached the tub to the wall and repaired the drywall.

{¶22} Matthew denied knowledge of any problems with the home at the time of the sale other than those identified in the Disclosure Form.

## C. Michael Lawson's Testimony

{¶23} Michael Lawson, Christy's ex-husband, testified that he lived in the home until approximately 2006. Lawson noted the remodeling of the bathrooms and that the fireplace was not functional. He testified that he would sometimes use the water softener in the house but would often bypass the system. Also, Lawson recalled that when he and Christy were purchasing the home a home inspector told him that he believed the gutters were old and would need to be replaced within the next couple of years. Lawson did not testify to whether he ever shared this information with Christy.

## D. Amber Avila's Testimony

{¶24} Avila admitted that when she toured the house with her realtor she observed water spots or stains on the walls or ceiling in multiple rooms. Avila testified that her main concern after walking through the house was determining whether the water spots were current and ongoing. She raised the issue with her inspector and he assured her the water spots or stains were dry and not ongoing problems. She also admitted she found mold

under the sink, on the basement walls, and on the ductwork.[2] She testified that she was not concerned about it because she saw no "current ongoing water" and she expected to find mold in an old home. Avila also admitted that the inspector showed her various electrical problems in the garage and basement, and that he told her about the large nests in the attic.

{¶25} Avila testified that, in deciding to move forward with the purchase of the house, she relied on the inspector's assurance that he had no concerns with the house after his second inspection, on her inspector's assurance that the water spots and stains were dry, and on the disclosures in the Hugheses' Disclosure Form.

{¶26} Avila testified regarding the numerous defects she found in the home while living there. Avila admitted that after moving into the house she was upset with the quality of the home inspection and that many of the problems with the home would have been identified by a reasonable inspection. Specifically, she admitted that a reasonable inspection would have revealed:

> Issue with the outside hose, kitchen sink, downstairs bathroom faucet, leaking of the upstairs toilet, sink, the wetness and mold underneath the wood board underneath the kitchen sink, temperature of the water, water pressure, the crack in the boot around the water vent, better inspection of the flashing around chimneys, the flue pipe on the water heater, the exposed pipe from where the other water heater was, the lack of the ductwork being properly connected to the back chimney, the crack in the outside panel box, exposed wires, [and] the leak roof in the garage. (Examining document.)

> The foundation work, because that was not completed. The

---

2. We note that Avila attached an errata sheet to her deposition testimony. Avila sought to elaborate on her testimony concerning her observance of mold to include that she "did not know it was mold at that time." There are evident issues with this errata sheet because it does not strictly conform with the requirements of Civ. R. 30[E], which requires, inter alia, that she provide a reason for these changes. *Christian v. Wal-Mart Stores East, LP*, 5th Dist. Holmes No. 09CA014, 2010-Ohio-3040, ¶ 18; *Zitron v. Sweep-A-Lot*, 10th Dist. Franklin No. 09AP-1110, 2010-Ohio-2733, ¶ 22 (courts insist on strict adherence to the technical requirements of Rule 30[E]). Nevertheless, we need not pass upon its admissibility at this time as it does not alter the outcome of our analysis. *Lowe v. Local Union No. 14 U.A.W.*, 6th Dist. Lucas No. L-19-1042, 2020-Ohio-703, fn. 1. Avila was on notice of the condition she observed whether she was aware it was mold at the time or not.

issues with the attic insulation being below what is code, and that the debris was to be cleaned up around from the nest around the gable vent was not a complete job. The upstairs door, the new door not being the proper size or installed. I'm going to conclude with that.

{¶27} She also testified that she would not have closed on the house if the home inspector had identified these issues.

{¶28} Avila admitted that, prior to closing, no one prevented her from examining the kitchen sink hose, the shower faucet, the sink faucet, the upstairs bathroom toilet, the utility hoses, the utility sink, the water pressure, the hot water, the inside of the chimney, the roof, the furnace, the air conditioner, the basement floor drain, the windows, the back patio, the walkway, the foundation, or the electrical panel. In fact, she testified that she and the inspector were not prevented from examining anything in the home other than a few areas behind some household items in closets or other areas, and that even then no one prevented her or the inspector from moving those items to view behind them. She admitted that she did not know when the furnace began to leak, including whether or not it started leaking when the Hugheses owned the home.

{¶29} Avila explained that the bad smell came from buried clay pipes, which were broken, and that she had no reason to believe that the Hugheses knew that the pipes were broken. The break was only discovered when plumbers inserted a camera into the pipes. She also admitted that no one prevented her from having the pipes inspected by a plumber before the purchase of the house.

### III. Law and Analysis

{¶30} Avila appealed the trial court's decision granting summary judgment in favor of the Hugheses on their fraudulent misrepresentation, nondisclosure, or concealment claim. Avila raised a single assignment of error for review:

{¶31} THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO

THE APPELLEES ON APPELLANT'S FRAUDULENT CONCEALMENT, NON-DISCLOSURE AND MISREPRESENTATION CLAIMS. [sic]

{¶32} As noted above, in her appellate brief Avila listed a litany of alleged problems with the house. For purposes of our summary judgment analysis, we assume that the facts alleged by Avila—including the alleged defects she has identified—are true. Because we find the eight groupings of defects identified by the trial court to be useful, we will address Avila's assignment of error by separately analyzing those eight groupings.

## A. Standard of Review

{¶33} Courts of appeals review summary judgment decisions de novo, which means we review the trial court's judgment independently and without deference to the trial court's determinations, using the same standard in our review that the trial court should have employed. *Ludwigsen v. Lakeside Plaza, L.L.C.*, 12th Dist. Madison No. CA2014-03-008, 2014-Ohio-5493, ¶ 8. Pursuant to Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion which is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-70 (1998).

{¶34} The moving party bears the initial burden of informing the court of the basis for the motion and demonstrating the absence of a genuine issue of material fact. *Robinson v. Cameron*, 12th Dist. Butler No. CA2014-09-191, 2015-Ohio-1486, ¶ 9. Once this burden is met, the nonmoving party has a reciprocal burden to set forth specific facts showing there is some genuine issue of material fact yet remaining for the trier of fact to resolve. *Id.* In determining whether a genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party. *Vanderbilt v. Pier 27, L.L.C.*, 12th Dist. Butler No. CA2013-02-029, 2013-Ohio-5205, ¶ 8.

**B. Elements of Fraud Claim and Caveat Emptor**

{¶35} Claims of fraudulent misrepresentation, nondisclosure, or concealment require proof of the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to its truth or falsity that knowledge may be inferred, (4) with the intent of misleading another to rely on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Shannon v. Fischer*, 12th Dist. Clermont No. CA2020-05-022, 2020-Ohio-5567, ¶ 15, citing *Russ v. TRW, Inc.*, 59 Ohio St. 3d 42, 49 (1991).

{¶36} "An action for fraud may be grounded upon failure to fully disclose facts of a material nature where there exists a duty to speak." *Layman v. Binns*, 35 Ohio St.3d 176, 178, (1988); *Roberts v. McCoy*, 12th Dist. Butler No. CA2016-04-071, 2017-Ohio-1329, ¶ 16. Buyers are protected by law against "being misled by others into making unwise decisions which result in financial loss" when sellers fail to "fully disclose" material facts. *Miles v. McSwegin*, 58 Ohio St.2d 97, 99-100 (1979).

{¶37} "'A party is under a duty to speak, and therefore liable for nondisclosure if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.'" *Shannon* at ¶ 17, quoting *Armbruster v. Mason*, 5th Dist. Ashland No. CA-766, 1982 Ohio App. LEXIS 14819, *11-12 (July 20, 1982).

{¶38} R.C. 5302.30(D) establishes a circumstance in which a seller of residential real estate has a duty to speak. Pursuant to that statute, sellers of residential real estate must complete a disclosure form to inform potential buyers of "material matters relating to the physical condition of the property to be transferred * * * [and] the condition of the

structure of the property, including the roof, foundation, walls, and floors * * *." The statute further requires that any disclosure be made in good faith or with "honesty in fact in a transaction." R.C. 5302.30(A)(1).

{¶39} However, R.C. 5302.30(D) requires sellers to disclose on the form only those defects that are within their actual knowledge. *Roberts* at ¶ 17. R.C. 5302.30(F)(1) relieves sellers of liability for damages "allegedly aris[ing] from any error in, inaccuracy of, or omission of any item of information required to be disclosed in the property disclosure form if the error, inaccuracy, or omission was not within the transferor's actual knowledge." Moreover, sellers have no duty to inspect or acquire knowledge regarding defects of their property. *Roberts* at ¶ 17. Rather, the duty to conduct a full inspection falls on the purchasers and the disclosure form does not function as a substitute for such careful inspection. *Id.*

{¶40} There is an important limitation on the potential liability of sellers of residential property: the doctrine of caveat emptor. This doctrine precludes recovery "'in an action by the purchaser for a structural defect in real estate where (1) the condition complained of is open to observation or discoverable upon reasonable inspection, (2) the purchaser had the full and unimpeded opportunity to examine the premises, and (3) there is no evidence of fraud on the part of the vendor.'" *Roberts*, 2017-Ohio-1329 at ¶ 12, quoting *Layman v. Binns*, 35 Ohio St.3d 176, 178-79 (1988). "A defect is observable or discoverable if an ordinarily prudent person would discover it upon reasonable inspection." *Id.* The doctrine of caveat emptor is designed to finalize real estate transactions by preventing disappointed real estate buyers from litigating every imperfection existing in residential property. *Kearns v. Huckaby*, 12th Dist. Butler No. CA2005-12-507, 2006-Ohio-5196, ¶ 18.

**C. Analysis of Defects**

**1. Water intrusion or leaking at the roof, gutters, and basement**

{¶41} Avila complains about numerous instances of water intrusion, which she blames on the roof and gutters. The trial court determined that the water intrusion as to the gutters was open or discoverable upon a reasonable inspection. As to the water infiltration within the walls, the trial court cited Avila's own testimony that she observed water spots in multiple locations within the home and concluded that the water intrusion in the walls was therefore discoverable upon a reasonable inspection.

{¶42} On appeal, Avila does not argue that the water intrusions or infiltrations were not discoverable but argues that the Hugheses had to have been aware of the water intrusions and instead concealed or otherwise failed to disclose the problems in the Disclosure Form. She points to Lawson's deposition testimony that a home inspector told him in 2001 that the gutters would need to be replaced in the next couple of years, and Lawson's testimony that the gutters caused "the house to leak." In her appellate brief, Avila claimed that the "leaking was so bad that [Matthew] while they lived there replaced a roof section that was water-rotted" and then reutilized the same defective gutters.

{¶43} Following review, we find that Avila's argument is incorrect for a number of reasons. First, the record reveals that any issue with the gutters was an open and observable condition. It is undisputed that Avila had the home inspected by an inspector of her choosing and that inspector had an unimpeded opportunity to examine the premises, including the gutters. While Avila may now disagree with her inspector's characterization of the gutters as "acceptable," it is undisputed that her inspector not only had the opportunity to inspect the gutters but did so, twice. Though the inspector did observe that a portion of the roof had some rotted wood that needed replaced, his report after the second inspection indicated that all work to be completed had been done and that he had "no concerns for the property at this time."

{¶44} Avila's reliance on Lawson's testimony is misplaced because Lawson never

testified that he informed Christy (or Matthew) of the inspector's concern about the gutters needing replacement. Contrary to Avila's characterization, Lawson did not state that he knew water came into the house, but rather that he was aware of times that the gutters "would freeze and then would run over and have big icicles that would be between the soffit and * * * where the gutter meets * * * the roof." Similarly, Christy and Matthew testified that they were unaware of any problems with the gutters at the time of the sale and any testimony concerning the gutters was based on prior instances where they simply had to make a repair.

{¶45} Because it is undisputed that Avila and her inspector had the opportunity to inspect the gutters, any alleged defect with the gutters would have been open and discoverable, and there is no evidence of fraud, Avila cannot prove her fraud claim with respect to the gutters. *See Roberts*, 2017-Ohio-1329 at ¶ 12.

{¶46} As to the other conditions of the house involving water, including any water intrusion in the basement, we also agree with the trial court.[3] Avila admitted that she observed water spots in the home and therefore actually discovered the issue. Our conclusion applies also toAvila's description of water getting behind the tub, which appears to be based on the Hugheses' testimony where they described the tub slipping from the wall and their subsequently repairing the drywall and resetting the tub. There is no record evidence that the Hugheses' hid any defect from Avila or prevented the home inspector from inspecting the tub or the drywall around the tub. Avila offers only speculation on this issue. *Arnett v. Mong*, 12th Dist. Fayette No. CA2015-10-022, 2016-Ohio-2893, ¶ 20 (mere

---

3. We note that the record and briefing on many of these and other issues is unnecessarily confusing. In her statement of facts, Avila lists a series of problems with little detail, elaboration, or context. We have exhaustively combed the record to fairly extrapolate and elaborate all of her claims and arguments. Following extensive review, we find all the defects that Avila complains about—with the possible exception of the bad smell/broken pipes and the windows with condensation discussed below—were open and discoverable by reasonable inspection and are therefore precluded by the doctrine of caveat emptor.

speculation is insufficient to defeat summary judgment). It remains undisputed that Avila was aware of water stains on the walls or ceilings in multiple rooms in the house, and thus the home's water problems were actually discovered. Even if the Hugheses' repair of the tub failed to address the underlying problem, Avila has offered no evidence suggesting that the Hugheses were aware of any failure on their part or of any ongoing problem in that area.

{¶47} For these reasons, we agree with the trial court that any water intrusion caused by the gutters or other water infiltration in the walls was "open to observation or discoverable upon reasonable inspection." *Roberts*, 2017-Ohio-1329 at ¶ 12. Caveat emptor bars Avila's fraud claim with regard to water intrusion and infiltration. Furthermore, Avila could not prove fraud in these circumstances because she could not reasonably rely on any assurances she may believe she received regarding water intrusion because the condition was actually discovered. *Shannon*, 2020-Ohio-5567 at ¶ 15.

**2. Mice**

{¶48} The next defect raised by Avila is the house's mouse problem. Following review, we agree with the trial court's conclusion that the mouse problem was an open and discoverable defect. In fact, the mouse problem was not just discoverable, but discovered: as correctly noted by the trial court, the home inspector alerted Avila to the mouse nests in the attic and identified points of entry. The inspector even pointed out that the mouse nests were large enough for Avila herself to crawl into one. Furthermore, the removal of said nests was a condition of USDA financing. Avila admitted during her deposition that she knew about the nests and that she was concerned about animal infiltration due to missing mortar, but she bought the house anyway. Given these undisputed facts, and given the lack of any evidence of fraud, Avila's claim with regard to the mouse defect was barred as a matter of law by caveat emptor. *Roberts*, 2017-Ohio-1329 at ¶ 12. Furthermore, even if caveat emptor did not apply, Avila could not prove the justifiable reliance element of her

fraudulent misrepresentation, nondisclosure, or concealment claim because she was actually aware of the mouse problem. *Shannon*, 2020-Ohio-5567 at ¶ 15.

### 3. Fireplace/Chimney

{¶49} Avila next complains that the fireplace and chimney were defective. Avila points to the Hugheses' disclosure in the Disclosure Form that the chimney was "not used/never inspected" and argues that the Hugheses in fact knew the fireplace was inoperable, falsely claimed otherwise, and painted over cracks in the fireplace.

{¶50} Once again, the trial court correctly concluded that the problems with the chimney and fireplace were discoverable upon ordinary inspection—and in fact were discovered. The undisputed facts show that Avila's home inspector stated in the inspection report that the chimney was "defective" and in need of repair. Avila closed on the sale of the property anyway. Given these undisputed facts, caveat emptor bars Avila's claim with respect to the chimney and fireplace. *Roberts*, 2017-Ohio-1329 at ¶ 12. Additionally, while Christy Hughes admitted to painting the outside of the home, there is no evidence in the record suggesting that she did so in order to conceal any defect with the fireplace or chimney. Given the lack of evidence of fraud and given Avila's actual knowledge that the chimney was defective, Avila could not prove fraud even if caveat emptor did not apply. *Shannon*, 2020-Ohio-5567 at ¶ 15.

### 4. Water softener

{¶51} Next, Avila complains about the defective water softener. Avila argues that the Hugheses actually knew the water softener was inoperable and therefore their statement on the Disclosure Form that the water softener "was never used" was a misrepresentation. To support this theory, Avila points out that Lawson testified that he remembered using the water softener on some occasions.

{¶52} The trial court determined that, even if the Hugheses knew that the water

softener did not work, there was no evidence that the inspector was prevented from inspecting the water softener and therefore the defect was open or discoverable upon reasonable inspection. Following review, we conclude that the undisputed facts demonstrate that the condition related to the water softener was open and discoverable. The Disclosure Form clearly indicated that the water softener was not used and therefore would have alerted a third party that it may not be operable. Though Lawson recalled that he sometimes used the water softener, his testimony concerned his time in the house more than a decade before the Hugheses sold it to Avila. Christy testified that the water softener was disconnected, and Matthew confirmed that the water softener was inoperable and not connected when he lived in the house. Avila's home inspector was granted full access to the home to complete his inspection report and there is no evidence to suggest that he was prevented from inspecting the water softener. Accordingly, we agree with the trial court that the undisputed evidence can only lead to the conclusion that the defect with the water softener was open and discoverable. Caveat emptor bars Avila's claim with respect to the water softener. *Roberts*, 2017-Ohio-1329 at ¶ 12. Nor can Avila prove fraud when she has offered no evidence suggesting that the Hugheses disclosure regarding the water softener was false or made with disregard or recklessness as to its truth or falsity. *Shannon*, 2020-Ohio-5567 at ¶ 15.

### 5. Plumbing issues

{¶53} Avila complains about a number of plumbing issues, including that the kitchen hose sprayed everywhere and the shower faucets leaked. The trial court noted that Avila testified that she discovered these problems the first time she used the kitchen hose and the shower faucets and so those conditions were discoverable upon reasonable inspection. Next, the trial court addressed Avila's claim that the house did not have enough water pressure or hot water. The Hugheses answered in the Disclosure Form that the water

pressure was sufficient for their household use. The trial court concluded, even assuming that the water pressure or hot water was a material defect, it was nevertheless discoverable upon reasonable inspection.

{¶54} We agree. Avila was in the house multiple times prior to closing when she could test the above-mentioned plumbing issues and there is no evidence to suggest that the home inspector was prevented from discovering any plumbing issue. In fact, Avila's home inspector listed the plumbing as "Acceptable." Caveat emptor bars Avila's claim with respect to the plumbing issues. *Roberts*, 2017-Ohio-1329 at ¶ 12. Nor could she prove a fraud claim with respect to these conditions. *Shannon*, 2020-Ohio-5567 at ¶ 15.

### 6. Bad smell

{¶55} Avila complains of a bad smell in the house that she testified was later determined to be caused by broken pipes. Rather, Avila testified that a plumber had to put a camera into the lines to actually discover the problem with the broken pipes.

{¶56} Again, we agree with the trial court's analysis. There was no evidence that the Hugheses ever had a professional inspect the problem and notify them of this defect, or that they were otherwise aware of the broken pipes. In fact, Avila admitted that she had no reason to believe that the Hugheses were aware of the broken pipes. Sellers have no duty to inspect or acquire knowledge regarding defects of their property. *Roberts*, 2017-Ohio-1329 at ¶ 17. Rather, the duty to conduct a full inspection falls on the purchasers and the disclosure form does not function as a substitute for such careful inspection. *Id.* Accordingly, Avila cannot prove a claim of fraudulent misrepresentation, nondisclosure, or concealment with regard to the bad smell and the broken pipes. *Id.*

### 7. Electrical problems

{¶57} Avila complains about several electrical problems in the home, including exposed wires, a cracked electrical box, and an exposed wire that was blocked by a dryer.

The trial court, once again, found these to be conditions that could have been discovered upon ordinary inspection.

{¶58} Following review, we agree with the trial court. Once again, there is no evidence in the record to suggest that the home inspector was denied any ability to observe and discover any defects with the electric. In fact, the home inspector detected several electrical issues that needed addressed and that the USDA also required to be repaired. Following his reinspection, Avila's home inspector stated that the work, including the electrical, was completed, "looked good," and that he had "no concerns for the property at this time." Because the electrical problems that Avila now complains of were discoverable upon ordinary inspection, her fraud claim with regard to those conditions is barred by caveat emptor. *Roberts*, 2017-Ohio-1329 at ¶ 12. Nor has Avila offered any evidence of fraud or concealment. *Shannon*, 2020-Ohio-5567 at ¶ 15.

### 8. Other conditions

{¶59} Avila next complains of a leak at the front porch and a leak at the furnace. The trial court found these were discoverable conditions.[4] On appeal, Avila does not elaborate on why the leaks at the front porch or furnace were undiscoverable. She only argues that she "noticed" the leak on the porch when it rained and that the leak at the furnace became "apparent" only when in use. There is no evidence that the Hugheses hid these defects or otherwise prevented the home inspector from inspecting the front porch or the furnace. As with other conditions listed above, we conclude that these conditions were discoverable upon ordinary inspection; Avila's fraud claim with regard to these conditions is barred by caveat emptor. *Roberts*, 2017-Ohio-1329 at ¶ 12.

---

4. The trial court did not provide an extensive discussion regarding the front porch and the leak at the furnace, but with the exception of the basement windows found that all of the defects listed by Avila were open and discoverable by reasonable inspection and were precluded by the doctrine of caveat emptor.

{¶60} Finally, the trial court found that another defect, the condensation on the basement windows, was not open to observation or discoverable. Avila alleges that the windows were misfitted and defective, but that she could only discover said defects when the weather was wet or cold. Since she purchased the house in the summer, Avila claims that she could not have discovered this defect prior to closing. Avila also argues that the Disclosure Form stated the windows were replacements, which implied they were newer and in good condition.

{¶61} The trial court determined that Avila could not prove fraud with regard to the windows and condensation—again, defects it determined were not open and discoverable—because the real estate purchase contract was contingent on inspection. In reaching this conclusion the trial court relied on *Roberts*, which stated that "[a] buyer cannot be said to have justifiably relied upon representations made by the seller where the purchase agreement is clearly contingent upon the inspection, rather than any alleged misrepresentations." *Roberts*, 2017-Ohio-1329 at ¶ 25-26.

{¶62} Assuming the trial court was correct that the problems associated with the windows and condensation were not open and discoverable, we agree with the trial court but for a slightly different reason. While the trial court correctly quoted *Roberts*, there is more to the analysis. In *Shannon*, we explained that "*Roberts* continues to apply in situations where the disagreement between a buyer and seller involves passive nondisclosures. However, *Roberts* does not control a situation where sellers make positive misrepresentations or actively conceal latent defects." *Shannon* at ¶ 48. In *Shannon*, we determined there was a genuine issue of material fact precluding summary judgment because there was testimony suggesting that the sellers were aware of repeated water intrusions that caused mold in a basement. *Id*. at ¶ 57. For example, a neighbor testified that he observed the seller pumping water out of the basement on at least four occasions.

*Id.* at ¶ 57. Avila has produced no similar evidence suggesting positive misrepresentation or active concealment by the Hugheses with regard to the basement windows. Instead, this case is more like *Roberts* than *Shannon*. In *Roberts*, the sellers informed the buyer that the basement had flooded, that there was moisture in the basement, and that the seller believed it had fixed the problem. *Roberts* at ¶ 3. The buyer decided not to have a mold inspection performed but brought suit in part based on mold found in the basement after purchase. *Id.* at ¶ 3-6, 14. We determined that the buyer did not reasonably rely on the seller's representations because she was informed of the flood history, the moisture, and the repairs, yet she chose not to hire a mold inspector and so could not prove fraud. *Id.* at ¶ 25. The trial court properly granted summary judgment. *Id.* at ¶ 26.

{¶63} In this case, as in *Roberts*, the purchase agreement was contingent upon a home inspection, which was performed prior to closing. The Hugheses disclosed that the "basement gets wet when it rains but then dries out" and that the basement windows were replacements. Avila had the home inspected and had ample opportunity to address any concerns that she had with the windows and associated wetness in the basement. Despite those disclosures and a full home inspection, Avila chose to close on the sale of the home. Even if we assume that the defect in the basement windows was not open to observation and discoverable, Avila fails to present evidence that the Hugheses misrepresented or concealed anything regarding the basement windows. She therefore cannot prove fraud. *Shannon* at ¶ 15, 57.

**IV. Conclusion**

{¶64} Having reviewed all of Avila's arguments and the record, we find Avila's sole assignment of error is without merit and is hereby overruled. There are no genuine issues of material fact that would preclude an award of summary judgment to the Hugheses on Avila's fraudulent misrepresentation, nondisclosure, or concealment, and the evidence

submitted can only lead reasonable minds to the conclusion that the Hugheses are entitled to summary judgment on that claim. *Zivich*, 82 Ohio St. 3d at 369-70.

{¶65} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.