[Cite as *Fields v. Bodiker*, 2025-Ohio-192.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| ERICA FIELDS | : | |
| | : | |
| Appellant | : | C.A. No. 30131 |
| | : | |
| v. | : | Trial Court Case No. 2022 CV 04974 |
| | : | |
| ARTHUR E. BODIKER ET AL. | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 24, 2025

. . . . . . . . . . .

WALTER REYNOLDS, Attorney for Appellant

BRANDON C. HEDRICK, Attorney for Appellees

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Erica Fields appeals from the trial court's entry of summary judgment in favor of appellees Arthur and Kristin Bodiker on her complaint alleging fraud, breach of warranty, and negligent construction/unworkmanlike performance.

{¶ 2} Fields's lawsuit stemmed from her purchase of a home from the Bodikers.

She alleged that the Bodikers had misrepresented or concealed certain material defects in the home and did not remedy other defects despite agreeing to do so. The trial court entered summary judgment for the Bodikers, finding that Fields had been aware of the defects prior to closing, that the Bodikers had not provided a warranty for repairs, and that the Bodikers had not qualified as "builders-vendors" who could be liable for negligent construction or unworkmanlike performance.

{¶ 3} On appeal, Fields contends the essence of her complaint was for breach of contract and fraud rather than negligence. At a minimum, she maintains that genuine issues of material fact exist on the contract and fraud claims, precluding summary judgment for the Bodikers.

{¶ 4} To the extent that the complaint did state breach-of-contract claims, they failed as a matter of law because the Bodikers never agreed to replace the home's rubber roof, remedy issues causing water intrusion, or treat and remove microbial growths, as alleged by Fields. The fraud claim likewise failed as a matter of law because Fields did not justifiably rely on representations in a property-disclosure form. Additionally, the record lacked evidence that the Bodikers possessed actual knowledge of some of the problems at issue. Accordingly, for the reasons set forth below, the trial court's judgment will be affirmed.

## I. Background

{¶ 5} In April 2022, Fields contracted to purchase the Bodikers' home for $330,000. In connection with the transaction, the Bodikers provided her with a residential property-disclosure form denying actual knowledge of various adverse conditions affecting the

property. As relevant here, the Bodikers denied knowing of any previous or current problems with the roof or rain gutters, water intrusion, water accumulation, excess moisture, or water or moisture-related damage. The form included boilerplate language advising that "every home has mold" and recommending that potential purchasers have a mold inspection performed.

{¶ 6} After signing a purchase agreement, Fields had the home inspected by Wade Jordan from Cardinal Pro Inspections. Jordan provided her with a 52-page report detailing his findings regarding the home, which had been built in 1885. Jordan's most significant findings concerned the roof, water intrusion in the stone-walled basement, and microbial growths in the basement. He determined that the "roof surface on the upper area of the home [was] at the end of its service life," and he recommended replacement. His report included a picture of an asphalt-shingle portion of the roof.

{¶ 7} Regarding water intrusion, Jordan noted that "[e]vidence of current and prior water intrusion was found in the basement at the exterior stairs." His report included pictures of basement stairs and walls below the cellar doors. He observed "sediment stains on the foundation, and/or efflorescence on the foundation." He recommended "that a qualified contractor who specializes in drainage issues evaluate and repair as necessary." Jordan's report advised Fields that typical repairs for preventing water intrusion in a basement might include "[r]epairing, installing or improving rain run-off systems (gutters, downspouts and extensions or drain lines)," "[i]mproving perimeter grading," or "[r]epairing, installing or improving underground footing and/or curtain drains."

{¶ 8} Finally, Jordan noted that "[m]icrobial growths were found in the basement."

His report included two pictures of such growths—one on the wall near the basement stairs and one on a piece of wood in that area. The report advised Fields that identifying the growth was beyond the scope of the inspection. Jordan explained, however, that staining from microbial growths normally was caused by "excessively moist conditions, which in turn can be caused by plumbing or building envelope leaks and/or substandard ventilation." He recommended consulting a qualified mold/moisture specialist for evaluation and possible mitigation.

{¶ 9} Following Jordan's inspection and prior to closing, Fields did not consult any experts or have any additional inspections performed. Instead, she provided the Bodikers with a form "defect notice" requesting repairs to the home. As relevant here, the notice asked the Bodikers (1) to "[r]eplace roof coverings" for the home and garage, (2) to repair problems "that are causing water intrusion," and (3) to treat and remove microbial growths.

{¶ 10} The Bodikers responded by providing Fields with a "seller's agreement for corrections," which identified specific repairs they were willing to make. As relevant here, the Bodikers agreed to "replace roof to house and add weather stripping to cellar door." In response to Fields's concern about microbial growths in the basement, the Bodikers hired a company known as Rapid Mold Remediation to inspect the portion of the basement near the cellar doors where Jordan had found microbial growths and evidence of water intrusion. A post-inspection report from Rapid Mold Remediation "found no visible microbial growth in this space." The technician noted only discoloration on the limestone steps. The Bodikers provided this report to Fields. On the form where they agreed to

make certain repairs, the Bodikers noted: "No mold was found." They did not agree to remediate any microbial growths.

{¶ 11} Fields subsequently signed a "buyer's acceptance" form, agreeing to the repairs the Bodikers had offered to make. Prior to closing, the Bodikers hired Dayton Roofing Solutions to replace the asphalt-shingle roof on the home. They also retained Brooks Home Repair and Handyman Services to install weather stripping on the cellar door leading into the basement. Following these repairs and a few others that are not relevant here, the real estate transaction closed on May 17, 2022.

{¶ 12} According to Fields, she discovered high humidity levels in the home shortly after purchasing it. She also became aware of a mildew smell. One week after closing, she contacted Rapid Mold Remediation and discovered that the company only had checked for mold in the area around the cellar door. Within a few weeks of closing, Fields hired a company known as Turn-Key Environmental to conduct a full home inspection. The inspection revealed the presence of mold. It also revealed a sub-roof attic leak under a flat rubber portion of the roof that had not been replaced by Dayton Roofing Solutions. Fields additionally discovered leaks under bathroom and kitchen sinks and a leaking toilet wax ring. Following heavy rains, she found standing water in the basement. She learned that the new weather stripping was not preventing water intrusion at the cellar door. She also discovered that two downspouts on her gutter system needed to be replaced to correct a drainage problem. Finally, she became aware that a basement drain was non-functional, requiring her to have a sump pump installed.

{¶ 13} In November 2022, Fields filed a four-count complaint against the Bodikers.

Count I alleged fraudulent concealment and misrepresentation. Count II alleged breach of warranty as to quality of inspections and quality of construction. Count III alleged negligent construction/unworkmanlike performance. Count IV alleged incidental and consequential damages.

{¶ 14} Following discovery, the parties filed competing motions for summary judgment. On April 2, 2024, the trial court filed a decision, order, and entry sustaining the Bodikers' motion and overruling Fields's motion. Fields timely appealed, advancing two assignments of error.

## II. Analysis

{¶ 15} Fields's first assignment of error states:

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS AND IN DENYING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF, ERICA FIELDS, ON HER BREACH OF CONTRACT CLAIM.

{¶ 16} Fields challenges the trial court's entry of summary judgment against her on the second and third counts of her complaint. Although those counts alleged breach of warranty, negligent construction, and unworkmanlike performance, Fields cites *Abroms v. Synergy Bldg. Sys.*, 2011-Ohio-2180 (2d Dist.), and insists that each claim, at its core, in reality was a breach-of-contract claim rather than a tort claim.

{¶ 17} Applying contract principles, Fields argues that the Bodikers' signed agreement to make certain repairs contractually obligated them to do the three things requested in her written defect notice, namely replace all roof coverings for the home,

repair issues causing water intrusion, and treat and remove microbial growths. Despite allegedly promising to do these things, Fields argues that the Bodikers did none of them, thereby breaching a contract created by the defect notice and the Bodikers' written response to it. Fields further argues that the Bodikers could not shield themselves from contractual liability for insufficient or ineffective repairs by hiring contractors to do the work. Therefore, she contends the trial court erred in finding that any claim regarding the quality or adequacy of the work should be raised against the contractors.

{¶ 18} In response, the Bodikers contend Fields's first assignment of error fails because the second and third counts in her complaint did not allege breach of contract. In any event, the Bodikers also assert that any breach-of-contract claims failed as a matter of law because they had never agreed to do the things Fields mentions. Finally, if we conclude that Fields's cause of action for negligent construction/unworkmanlike performance sounded in tort rather than contract, the Bodikers assert that the trial court properly entered summary judgment for them.

{¶ 19} "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 2005-Ohio-2163, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

{¶ 20} When reviewing summary-judgment decisions, appellate courts apply de

novo review. *A.J.R. v. Lute*, 2020-Ohio-5168, ¶ 15. An appellate court independently reviews the evidence without deference to the trial court's findings. *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30, citing *Wilmington Savs. Fund Soc., FSB v. Salahuddin*, 2020-Ohio-6934, ¶ 20 (10th Dist.). A reviewing court "examines the evidence available in the record, including deposition or hearing transcripts, affidavits, stipulated exhibits, and the pleadings, *see* Civ.R. 56(C), and determines, as if it were the trial court, whether summary judgment is appropriate." *Id.*, citing *Wilmington Savs. Fund Soc.* at ¶ 19.

{¶ 21} With the foregoing standards in mind, we see no error in the trial court's entry of summary judgment against Fields on the second and third counts of her complaint. Although the Bodikers question whether the complaint pleaded breach of contract, we will accept, arguendo, that counts two and three alleged a contractual breach, as Fields insists on appeal. But even accepting her argument on this point, the breach-of-contract claims failed as a matter of law because the Bodikers never agreed to replace the home's rubber roof, remedy issues causing water intrusion, or treat and remove microbial growths.

{¶ 22} Fields's breach-of-contract argument rests on a faulty interpretation of the defect notice and the Bodikers' response to it. Her post-inspection defect notice advised the Bodikers that she had completed her inspections, identified defects in the real estate, and requested that the sellers make specified corrections. The defect notice referenced portions of the inspection report that Wade Jordan had prepared. Notably, each requested repair was accompanied by a citation to a numerical section of Jordan's report. They included: "(1.0) Replace roof coverings for home and (12.1) garage" as well as "(3.0)

Repair of issues that are causing water intrusion" and "(3.8) Treatment and removal of microbial growth." In contract terms, Fields's defect notice seeking to have the Bodikers perform these repairs constituted an offer. *See, e.g.*, *Bennett v. Fier*, 1998 WL 350538, *3-*5 (2d Dist. July 2, 1998).

{¶ 23} In their response, the Bodikers did not agree to do what Fields had asked. As relevant here, they only agreed "to replace roof to house and add weather stripping to cellar door." Their response contained no agreement to stop water intrusion or to treat and remove microbial growths. Given that the Bodikers' written response differed materially from Fields's defect-notice offer, the response constituted a rejection and a counteroffer. *Id.* at *5. Page five of the parties' real-estate contract explicitly characterized the response to Fields's defect notice as a "counter-offer" identifying what defects, if any, the sellers were willing to correct. Fields accepted the Bodikers' counteroffer to make only limited specified repairs when she signed the "buyer's acceptance" form. As a contractual matter, then, all the Bodikers were obligated to do was "replace roof to house and add weather stripping to cellar door."

{¶ 24} A contractor subsequently did add weather stripping to the cellar door. Although Fields objects that the weather stripping did not keep water out of the basement, she does not claim it was installed improperly. She argues only that it constituted an ineffective water-intrusion remedy. Prior to accepting the Bodikers' proposal to add weather stripping, however, Fields could have explored the potential effectiveness of that repair. If she had concerns, she could have rejected the proposed installation and suggested something else. We see no breach-of-contract claim arising from the Bodikers'

installation of the agreed-upon weather stripping.

{¶ 25} Whether the Bodikers breached a contract by replacing only the asphalt-shingle roof requires more detailed analysis. As noted above, Fields's defect notice requested replacement of roof coverings for the home and garage. The Bodikers rejected that proposal and agreed to replace only the "roof to house." Fields accepted that counteroffer. On appeal, she contends the Bodikers breached the parties' agreement by replacing only the asphalt-shingled portion of the roof and not a smaller rubber-roof area.

{¶ 26} Given that the house had an asphalt-shingle roof and a distinct rubber-roof area, the agreement for the Bodikers to replace the "roof" was ambiguous. Where ambiguity exists, courts may consider extrinsic evidence to determine the parties' intent. *Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 2020-Ohio-1471, ¶ 17 (1st Dist.). "Although ordinarily courts should not grant summary judgment when an ambiguity exists, . . . if the extrinsic evidence stands undisputed, then the court may take this step." (Citations omitted.) *Id.* at ¶ 18. "Such extrinsic evidence may include circumstances surrounding the parties' negotiations or actions at the time they entered into the contract, the objectives they intended to accomplish, and any actions by the parties demonstrating how they interpreted the ambiguous term." *Id.*

{¶ 27} Here the record contains uncontroverted extrinsic evidence establishing that the parties' reference to "the roof" meant only the asphalt-shingle roof that Dayton Roofing Solutions replaced prior to the closing. The inspection report Fields received from Wade Jordan described the "roof covering type" as being dimensional shingles and included pictures of asphalt shingles. Moreover, Jordan's report only noted problems with

the "roof surface on the upper area of the home" and the "garage roof." The report's reference to the upper area of the home included a picture of the asphalt-shingle portion of the roof. The reference to the garage roof likewise included a picture of the asphalt-shingle garage roof. In her defect notice requesting replacement of roof coverings for the home and garage, Fields cited these specific portions of Jordan's inspection report by numerical reference.

{¶ 28} In his deposition, Jordan confirmed that his only concerns about the roof involved the loss of granules on the asphalt shingles. He recalled discussing that issue with Fields. Although his inspection included the rubber-roof area, he did not recall finding any problems with it. He did not recall even discussing the rubber roof with Fields. Additionally, the contractor hired to replace the asphalt roof, Dayton Roofing Solutions, noted that "the flat rubberized portion of the roof . . . had not reached its lifespan, was undamaged, and not leaking."

{¶ 29} Based on the foregoing evidence, we see no genuine issue of material fact as to what the parties meant when they agreed to the Bodikers' replacement of the "roof" on the house. As a matter of law, the only reasonable interpretation is that they were referring to the asphalt-shingle roof. It was the only problematic part of the roof referenced in Jordan's inspection report, it was the only part of the roof identified by numerical reference to Jordan's report in Fields's defect notice, and it was the only worn-out part of the roof observed by anyone.

{¶ 30} As a matter of law, the Bodikers did everything they promised to do in their written repair agreement with Fields. They added weather stripping to the cellar door, and

they replaced the asphalt-shingle roof on the house. Fields's argument that the Bodikers committed a breach of contract by failing to remedy any issues causing water intrusion and by failing to treat and remove microbial growths fails as a matter of law because they did not agree to do those things. We see no genuine issue of material fact for trial as to breach of contract. Accordingly, the first assignment of error is overruled.

{¶ 31} Fields's second assignment of error states:

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS AND IN DENYING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF, ERICA FIELDS, ON HER FRAUD CLAIM.

{¶ 32} Fields contends the Bodikers committed fraud in their written response to her defect notice and in their property-disclosure form. She also argues that they committed fraud by failing to supplement the disclosure form after signing it. At a minimum, she maintains that genuine issues of material fact exist.

{¶ 33} As to the defect notice, Fields alleges that the Bodikers' written response contained three fraudulent misrepresentations or concealments: (1) they promised to remedy water intrusion in the basement, (2) they promised to replace the entire roof, and (3) they promised to treat and remove microbial growths in the basement. Fields asserts that the Bodikers in fact never intended to remedy water intrusion or replace the entire roof when they signed the repair agreement. Regarding microbial growths, she reasons that the Bodikers accepted her request for treatment and removal of microbial growths by hiring a company, Rapid Mold Remediation, to inspect the basement after receiving her defect notice. She alleges fraud because the Bodikers did not treat or remove any

microbial growths, and they only had the area below the cellar door inspected. Fields claims she discovered after closing that Rapid Mold Remediation's inspection had not encompassed the entire basement.

{¶ 34} Upon review, we see no genuine issue of material fact as to fraud in the Bodikers' response to Fields's defect notice. Although the Bodikers contend Fields failed to plead fraud regarding the defect notice, this aspect of her fraud claim fails as a matter of law even if we accept, arguendo, that it was pleaded adequately. As explained in our analysis of Fields's breach-of-contract claims, the Bodikers never agreed to replace the entire roof, remedy water intrusion, or treat and remove microbial growths. Extrinsic evidence established that references to the "roof" meant the asphalt-shingle covering. As for water intrusion, the Bodikers agreed only to install a piece of weather stripping, and Fields accepted that proposed remedy.

{¶ 35} Regarding microbial growths, the Bodikers did not agree to do anything. After receiving the defect notice, they hired Rapid Mold Remediation to investigate the area below the cellar door, which was the primary area where Fields's inspector had seen evidence of water intrusion and microbial growths. The Rapid Mold Remediation technician reported finding no mold. The Bodikers' subsequent written response to Fields's defect notice contained no promise to do anything to treat and remove microbial growths. Contrary to Fields's argument, the Bodikers' choice to hire a company to investigate the issue before responding to her defect notice did not constitute "acceptance" of her request for treatment and removal of microbial growths. We note too that Fields remained free to have a pre-closing inspection performed by a drainage

expert, as her own home inspector had recommended.

{¶ 36} We likewise see no genuine issue of material fact regarding fraud in the Bodikers' property-disclosure form. In her complaint, Fields specifically alleged fraud based on their failure to disclose (1) leaks in the roof, (2) prior leaks and repairs to the sub-flooring around the toilet in a first-floor bathroom, (3) water leakage, accumulation, and excess moisture in the basement, and (4) a code violation involving installation of a condensation pump to remove water from the basement.

{¶ 37} On appeal, Fields contends she discovered evidence of current and prior water intrusion and mold in the home shortly after closing. During discovery, she obtained evidence of prior roof repairs and remediation work to repair wood rot and a mildew problem. She also discovered a basement drain that was not functioning properly. Fields claims the Bodikers engaged in fraud by failing to mention these things on the disclosure form. Given that she discovered these issues shortly after obtaining occupancy, she contends a trier of fact reasonably could infer that the Bodikers knew about them.

{¶ 38} In response, the Bodikers assert that Fields cannot establish justifiable reliance on the property-disclosure form because her home inspector, Wade Jordan, placed her on notice of multiple issues that she failed to investigate. The Bodikers argue that an inspection report highlighting potential defects obligates a buyer to investigate them, particularly where the inspector recommends such action. In reply, Fields reasons that the Bodikers assumed responsibility to investigate and correct defects. She maintains that she relied on the Bodikers' agreement to do so, thereby relieving herself of any obligation to investigate potential problems after receiving her home-inspection report.

{¶ 39} To prove fraud, a plaintiff must establish "(1) a representation (or concealment of a fact when there is a duty to disclose), (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance." *Schroeder v. Henness*, 2013-Ohio-2767, ¶ 19 (2d Dist.).

{¶ 40} In *Seitz v. Harvey*, 2015-Ohio-122 (2d Dist.), we recognized that Ohio law obligates "sellers to act in good faith and to disclose facts regarding 'material matters relating to the physical condition of the property to be transferred.' " *Id.* at ¶ 25, quoting R.C. 5302.30(C). We also recognized that a violation of this duty is not dispositive of whether a non-disclosure constitutes fraud. *Id.* "The rule of caveat emptor still exists in Ohio and applies 'to patent defects: those which are readily discoverable to prospective purchasers on inspection.' " *Id.* at ¶ 29, quoting *Decaestecker v. Belluardo*, 2008-Ohio-2077, ¶ 37 (2d Dist.). " 'When a plaintiff claiming fraud in the sale of property has had the opportunity to inspect the property, he is charged with knowledge of the conditions that a reasonable inspection would have disclosed.' " *Id.*, quoting *Kramer v. Raterman*, 2005-Ohio-2742, ¶ 14 (1st Dist.). This rule applies regardless of whether an inspector in fact noticed the defect. *Id.* at ¶ 27. Moreover, when a home inspection places a buyer on notice of an issue, the buyer has " 'a duty to make further inspection.' " *Id.* at ¶ 31, quoting *Niermeyer v. Cook's Termite & Pest Control, Inc.*, 2006-Ohio-640, ¶ 27 (10th Dist.).

{¶ 41} In the present case, Fields noticed "a smell in the home" when initially

viewing it. *See* Fields May 25, 2023 Deposition at p. 41. The odor was "a concern but nothing that [she] thought was of any consequence" given the home's age. *Id*. After the Bodikers accepted her offer, Fields walked through the home again with Wade Jordan, her inspector. He pointed out "several places throughout the basement" where he thought he saw "microbial growths." Jordan told her the growths most likely were mold. According to Fields, he explained that mold was not uncommon in "a home of this age." He nevertheless recommended that she get it tested and treated. *Id*. at p. 45. Fields also recalled Jordan telling her that the cellar door appeared to be allowing water into the basement. *Id*.

{¶ 42} Following the inspection, Jordan provided Fields with a lengthy report. Section 3.0 of the report addressed water intrusion in the basement. Under the "comments" section, it stated:

> Evidence of current and prior water intrusion was found in the basement at the exterior stairs. For example, sediment stains on the foundation, and/or efflorescence on the foundation. *Recommend that a qualified contractor who specializes in drainage issues evaluate and repair as necessary.* Typical repairs for preventing water from accumulating in basement include:
>
> - *Repairing, installing or improving rain run-off systems (gutters, downspouts and extensions or drain lines*)
> - Improving perimeter grading
> - *Repairing, installing or improving underground footings and/or curtain drains*

(Emphasis added.)

{¶ 43} Section 3.8 of Jordan's report addressed "microbial growths." It stated:

Microbial growths were found in the basement. It is beyond the scope of this inspection to identify what substance or organism this staining is. *However, such staining is normally caused by excessively moist conditions, which in turn can be caused by plumbing or building envelope leaks* and/or substandard ventilation. *For evaluation and possible mitigation, consult with a qualified industrial hygienist or mold/moisture mitigation specialist.*

(Emphasis added.)

{¶ 44} After receiving Jordan's inspection report and prior to closing, Fields did not contact anyone specializing in drainage issues to see what repairs might be needed. She did not consult a mold or moisture-mitigation specialist to investigate water-related problems. Instead, after the Bodikers hired their own company to investigate the effects of water intrusion below the cellar door, Fields simply accepted their counteroffer proposal to add weather stripping.

{¶ 45} "[A] buyer's home inspection that documents signs of water intrusion or damage, such as dampness, a musty smell, seepage, stains, efflorescence, and the need for grading or drainage improvement, is generally sufficient to place a buyer on notice of potential water issues, *the cause and scope of which the buyer is charged with exploring further."* (Emphasis added.) *Bechtel v. Turner*, 2020-Ohio-4078, ¶ 40 (10th Dist.); *see also Jones v. Gilbert*, 2023-Ohio-754, ¶ 16 (3d Dist.) (citing *Bechtel* and recognizing that a buyer's reliance on a seller's fraudulent misrepresentation or concealment is not

justifiable, as a matter of law, where the buyer had other evidence of the issue prior to closing).

**{¶ 46}** Insofar as Fields's fraud claim involved allegations of water leakage, accumulation, excess moisture in the basement, and microbial growths, the trial court correctly found as a matter of law that there was no justifiable reliance on the Bodikers' property-disclosure form. Jordan's inspection report placed her on actual notice of potential water issues, the cause and scope of which she was responsible for investigating.

In her deposition, Fields identified the primary source of water intrusion as faulty downspouts that allowed water to pool near the foundation and leak into the basement. *See* Fields Deposition at p. 197-198. In her complaint, she acknowledged that replacing two downspouts on the gutter system corrected the problem by diverting rainwater away from the foundation. *See* Nov. 1, 2022 Complaint at ¶ 85. An inspection report obtained by Fields after she purchased the home included a picture of a downspout "not draining from foundation." *Id.* at Exh. 8, Appendix B. Notably, repairing or installing gutters or downspouts was one of several potential water-intrusion remedies that Wade Jordan had recommended having a drainage expert evaluate before Fields closed on the property. Moreover, Fields's post-closing picture of a downspout discharging against the foundation illustrates that the issue was open and readily observable. *Compare Avila v. Hughes*, 2021-Ohio-2463, ¶ 43 (12th Dist.) (holding that "any issue with the gutters was an open and observable condition" that the appellant's inspector had an opportunity to examine).

**{¶ 47}** As for Fields's reference to a faulty floor drain in the basement, it appears

that the drain collapsed at some point and was filled with cement. Fields alleged in her complaint that the Bodikers had committed a code violation by installing a condensation pump to remove water from the basement in lieu of the drain. She alleged fraud based on their failure to mention the code violation on the property-disclosure form. The Bodikers denied any knowledge of a code violation, however, and we see no evidence to the contrary. Therefore, the drain issue did not raise a genuine issue of material fact for trial.

{¶ 48} Regarding Fields's fraud allegation based on a roof leak, the record reflects that the flat rubber-roof area leaked on March 3, 2023. This was nearly 10 months after she purchased the house and roughly 13 months after the Bodikers denied any previous or current roof leaks in the property-disclosure form. A leak occurring more than one year after the Bodikers completed the form, of course, did not constitute any evidence that they lied when they denied knowledge of current or prior roof leaks.

{¶ 49} On appeal, Fields argues that the Bodikers failed to disclose a prior leak involving the rubber roof. In her deposition, she testified that after purchasing the house, she saw evidence of prior attempts to patch the rubber roof. Fields inferred from this evidence that the rubber roof had leaked before. But the property-disclosure form had a five-year look-back period, meaning that the Bodikers were not obligated to disclose previous problems more than five years old. On appeal, the only evidence Fields cites to establish the Bodikers' knowledge of a prior leak is a February 23, 2017 written proposal from Bauer Roofing to perform work on the rubber roof. Notably, this proposal fell outside of the five-year look-back period. The Bodikers signed the property-disclosure form on

April 4, 2022, more than five years after Bauer Roofing's proposal. We note too that any leak or required repair necessarily would have pre-existed the proposal, meaning that the problem itself was even older.

{¶ 50} On appeal, Fields also alleges fraud based on the Bodkiers' failure to disclose having hired a painting company in 2020 to pressure wash the house and garage, scrape loose paint, apply primer/paint/stain/caulk to various exterior surfaces, and repair/replace some rotted wood siding. We see no genuine issue of material fact. The fraud claim alleged in Fields's complaint did not even address this exterior maintenance by a painting company. Nor did Fields raise the issue as a fraud claim in her June 20, 2023 motion for summary judgment.

{¶ 51} In any event, most of the work performed by the painting company did not involve defects that are required to be disclosed by sellers. The property-disclosure form obligated the Bodikers to reveal problems with "structural components," including interior or exterior walls, within the past five years. We question whether washing, scraping, painting, or staining exterior wood siding fell within the scope of the disclosure requirement, which focused on movement, shifting, deterioration, or cracking. We note too that the "water intrusion" portion of the form obligated the Bodikers to disclose water leakage, water accumulation, or excess moisture. The only aspect of the painting company's work that even arguably might have come within the scope of the disclosure form was its replacement of some rotted wood siding. We fail to see, however, how the fact that a painting company replaced some wood siding in 2020 while performing exterior maintenance had anything to do with Fields's substantive complaints in this case or

caused her any harm.

{¶ 52} As noted above, Fields's complaint additionally alleged fraud based on prior leaks and repairs to the sub-flooring around the toilet in a first-floor bathroom. The water damage apparently stemmed from a broken toilet flange, which Fields repaired after purchasing the house. She cites no evidence that the Bodikers were aware of the broken flange. Although part of the sub-flooring around the toilet previously had been replaced, the record contains no evidence establishing when that repair occurred.

{¶ 53} The record also reflects the existence of mold and evidence of water damage on other areas of sub-flooring as well. Once again, however, we see no evidence that the Bodikers were aware of any water damage under their floors. Finally, Fields's post-purchase inspection revealed water intrusion on sub-roofing in the attic and evidence of leaking kitchen and bathroom sink drains. But, again, she cites no evidence that the Bodikers had actual knowledge of these issues when they completed the property-disclosure form. In her deposition, Fields acknowledged that she could not see the water leaks below the kitchen and bathroom sinks because personal items in the vanity and cabinets "covered up" the leaks. But those same items presumably would have prevented the Bodikers from noticing that the drain pipes under the two sinks were dripping or leaking. Fields cites nothing to suggest otherwise.

{¶ 54} Fields next argues fraud arising from the Bodikers' failure to supplement their property-disclosure form after signing it. This argument concerns wind damage to the asphalt-shingle portion of the home's roof. The damage occurred on March 30, 2022. The Bodikers failed to disclose the damage when they signed the property-disclosure

form just a few days later. Even if the Bodikers lacked knowledge of the damage when they signed the form, Fields reasons that they engaged in fraud by failing to update the form after discovering the damage. This argument lacks merit for two reasons. First, the Bodikers replaced the wind-damaged asphalt-shingle roof prior to closing. Therefore, they had no need to update the form to mention damage. Second, and more importantly, page five of the properly-disclosure form explicitly stated that the Bodikers had "no obligation to update this form." For the foregoing reasons, the second assignment of error is overruled.

### III. Conclusion

{¶ 55} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.